**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LifeWorks Technology Group LLC, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | No. 17-CV-03217 |
| | ) | |
| v. | ) | Hon. Gary Feinerman |
| | ) | |
| Walgreen Co., | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |

### WALGREEN CO.'S ANSWER AND AFFIRMATIVE DEFENSES
### TO AMENDED COMPLAINT AND RESTATED COUNTERCLAIM

Walgreen Co. ("Walgreens"), by its undersigned counsel, answers Plaintiff/Counter-

Defendant LifeWorks Technology Group LLC's ("LifeWorks") Amended Complaint as follows:

## I.     NATURE OF THE ACTION

1.      This is an action for breach of contract against Walgreens, which failed and
refused to pay amounts due Plaintiff for certain goods, namely electronics, electronic
accessories, and fitness technology, that were produced for and delivered to Walgreens, and
additional goods with respect to which, by reason of the parties course of conduct and writing,
Walgreens was obligated to take in, accept and pay for. Walgreens plundered Plaintiff's goods,
traded upon Plaintiff's good hard work and inflicted substantial economic harm upon Plaintiff.

**ANSWER:**     Walgreens admits that LifeWorks purports to assert breach of contract

claims against Walgreens in this action. Walgreens denies liability to LifeWorks and otherwise

denies the remaining allegations contained in Paragraph 1.

## II.     PARTIES

2.      Plaintiff is, and was at all times relevant to the above captioned action (the
"Action"), a New York limited liability company with its principal place of business at 530 7th
Avenue, New York, NY 10018.

**ANSWER:**     On information and belief, Walgreens admits the allegations contained in

Paragraph 2.

3. Defendant Walgreens is an Illinois corporation with its principal place of business at 108 Wilmot Road, Deerfield, IL 60015. Defendant Walgreens owns retail pharmaceutical stores throughout the United States.

**ANSWER:** Walgreens admits the allegations contained in Paragraph 3.

### III. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1332(a)(1) and 1367 and general principles of ancillary and pendant jurisdiction because the matter in controversy exceeds $75,0000 and by reason of diversity of citizenship as follows:

**ANSWER:** Walgreens admits the allegations contained in Paragraph 4.

5. Plaintiff is a New York limited liability company and has its principal place of business located in New York, New York.

**ANSWER:** Walgreens admits the allegations contained in Paragraph 5.

6. Plaintiff's membership is comprised of Harry Adjmi, Amin Adjmi, Eddie Mizrahi, Solomon Fallas and Max Namer, who are all citizens of the State of New York.

**ANSWER:** On information and belief, Walgreens admits the allegations contained in Paragraph 6.

7. No owner/member of Plaintiff is a citizen of the State of Illinois.

**ANSWER:** On information and belief, Walgreens admits the allegations contained in Paragraph 7.

8. Defendant Walgreens is a citizen of the State of Illinois.

**ANSWER:** Walgreens admits allegations contained in Paragraph 8.

9. Venue in this district is proper pursuant to 28 U.S.C. §1391(b) because Walgreens resides in this district and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

**ANSWER:** Walgreens admits the allegations contained in Paragraph 9. Moreover, the parties "consent[ed] to the exclusive jurisdiction of the courts of the State of Illinois or Federal District Court of the Northern District of Illinois and agree[d] to waive all objections as to venue and *forum non conveniens*."

10.     This Court has personal jurisdiction over Walgreens: (a) based on the location of Walgreens' principal place of business; and (b) since Defendant engaged in one or more of the wrongful practices in this district and maintains sufficient minimum contacts with this district, such that the exercise of jurisdiction over Defendant by this Court does not offend traditional notions of fair play and substantial justice.

**ANSWER:**     Walgreens admits that this Court has personal jurisdiction over it based on the location of its principal place of business, but otherwise denies the allegations contained in Paragraph 10. Moreover, the parties "consent[ed] to the exclusive jurisdiction of the courts of the State of Illinois or Federal District Court of the Northern District of Illinois and agree[d] to waive all objections as to venue and *forum non conveniens*."

## IV.     FACTS COMMON TO ALL CAUSES OF ACTION

### A.     Outstanding Invoices

11.     Plaintiff is a wholesaler and importer of, amongst other things, electronics, consumer electronic accessories, and fitness accessories and typically, as herein relevant, manufactures and imports goods from Asia.

**ANSWER:**     Walgreens is without knowledge or information sufficient to form a belief about the extent to which Plaintiff imports goods and so denies the allegations of Paragraph 11 on that subject. Walgreens otherwise admits the allegations contained in Paragraph 11.

12.     Defendant Walgreens operates as the second-largest pharmacy store chain in the United States.

**ANSWER:**     Walgreens admits the allegations contained in Paragraph 12.

13.     In or about 2012, Plaintiff, through its representative and consultancy firm, First Delta Group, Inc., ("First Delta") was introduced to Defendant.

**ANSWER:**     Walgreens admits the allegations contained in Paragraph 13.

14.     Between 2012 and 2016, the Parties conducted business transactions with one another, wherein Rori Dansky ("Dansky"), a Category Manager at Walgreens, ordered goods from Plaintiff through First Delta.

**ANSWER:**     Walgreens admits that the parties conducted business transactions between 2012 and 2016. Answering further, the parties originally executed the Business Terms

Agreement on February 18, 2013 (the "Business Agreement"), and the Walgreen Co. General

Trade and Electronic Data Interchange Agreement on February 19, 2013 (the "GTA").

Walgreens admits that Rori Dansky is a Walgreens' Category Manager and that she oversaw

Walgreens' relationship with LifeWorks pursuant to the Business Agreement and GTA.

Walgreens admits that it ordered goods pursuant to the Business Agreement and GTA, but

otherwise Walgreens denies the remaining allegations contained in Paragraph 14.

     15.     Certain of the terms of the business transactions by and between Plaintiff and Walgreens were reflected in various written agreements, including a Walgreen Co. General Trade and Electronic Data Interchange Agreement (the "GTA") (the GTA is annexed hereto as Exhibit A) and, as applicable here, a Business Terms Agreement dated June 6, 2003 (a copy of the Business Terms Agreement is annexed as Exhibit B) and incorporated by reference herein, wherein "Vendor agree[s] to a guaranteed sale on all products sold to Walgreens contingent upon 60 day markdown strategy."

     **ANSWER:**     Walgreens admits that the parties entered the GTA and Business

Agreement, which agreements speak for themselves. Walgreens denies the allegations of

Paragraph 15 to the extent that they are inconsistent with the terms of those written agreements.

Answering further, Walgreens states that the GTA and Business Agreement governed all of the

parties' transactions.

     16.     In addition to the terms of the written agreements, Plaintiff and Walgreens agreed that the conduct of Plaintiff and Walgreens pursuant to the written agreements would evidence a course of dealing and a course of performance accepted by the parties in furtherance of their agreements and the transactions by and between Plaintiff and Walgreens.

     **ANSWER:**     The allegations of Paragraph 16 relate to Counts II and III of the

Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss

these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens

provides no answer here.

     17.     In fact, Exhibit 1 to the GTA at paragraph 4 (c) specifically provided:

     "Conduct. The conduct of the parties pursuant to this Agreement, including the use of Signed Documents properly transmitted, shall for all

legal purposes, evidence a course of dealing and a course of performance accepted by the parties in furtherance of this Agreement, and Transaction and any other written agreement described in Section 3(a)."

**ANSWER:**    The allegations of Paragraph 17 relate to Counts II and III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

18.    In addition to the recognition of the parties' course of dealing and a course of performance specifically provided for in the parties' written agreements, Walgreens Answer and Affirmative Defenses to Complaint and Counterclaim" against Plaintiff (Document #21 on the Court's Electronic Docket of this Action) ("Answer and Counterclaim") at page 15 specifically relies upon "The Parties' Course of Dealing" in framing Walgreens' Counterclaim against Lifeworks, thereby admitting the parties' course of dealing and the course of performance as an accepted part of the parties' agreement ("Agreement").

**ANSWER:**    The allegations of Paragraph 18 relate to Counts II and III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

19.    As part of the parties' course of dealing and course of performance, and to facilitate Plaintiff's timely delivery of products manufactured, produced and imported specifically from Asia for Walgreens, Walgreens, most frequently through First Delta, would "forecast" to Plaintiff, Walgreens' requirements for the consumer electronic accessories (the "Goods") Walgreens was ordering.

**ANSWER:**    The allegations of Paragraph 19 relate to Counts II and III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

20.    The forecasts communicated to Plaintiff were communicated long in advance of the required delivery date so as to enable Plaintiff to timely manufacture, produce and import the Goods from Asia for Walgreens.

**ANSWER:** The allegations of Paragraph 20 relate to Counts II and III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

21. In fact, because of the success of LifeWork's Goods at Walgreens, by 2015, these Goods were "in line" items at Walgreens, included in Walgreens "planograms" which are diagrams showing where retailers put products on shelves, racks and other store fixtures. The planograms play a role in inventory control too, because they help retailers determine the amount of inventory to keep on hand to restock shelves in accordance with the shelf space provided to each product.

**ANSWER:** The allegations of Paragraph 21 relate to Counts II and III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

22. Being an "inline" "planogram" product at Walgreens meant that Plaintiff, as the supplier, was required during and over the course of the year to consistently be in a position to immediately replenish the Goods in the "planogram", *i.e.,* Plaintiff and Walgreens would "forecast" Walgreens requirements for Goods and replenishment of the inline planogram product, it being Walgreens' intention to at all times keep Walgreens' retail shelves stocked with Goods for Walgreens' customers to purchase, and part of Plaintiff and Walgreens' Agreement that Plaintiff was obligated to replenish the inline planogram products, and Walgreens was obligated to take in, accept and pay for the replenishment as forecast.

**ANSWER:** The allegations of Paragraph 22 relate to Counts II and III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

23. To assist LifeWorks with the forecasting, Walgreens regularly issued detailed spreadsheet reports to LifeWorks showing, among other things, weekly sell through and inventory, month to date sales, and comparison of a current year's sales to prior year's sales. (the "Reports"),

**ANSWER:** The allegations of Paragraph 23 relate to Counts II and III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

24. Plaintiff, as well as other "Supplier Partner[s]" of Walgreens, were specifically told by Walgreens that Plaintiff would be assessed a "service level violation fee" to compensate Walgreens for "service interruptions" (lost sales and dissatisfied customers) where Plaintiff shipped Goods to Walgreens with less than a "95% On Time Fill Rate" performance. *See **Exhibit C***, attached hereto and incorporated by reference, an April 23, 2015 letter on Walgreens' letterhead to "Dear Valued Supplier."

**ANSWER:** The allegations of Paragraph 24 relate to Counts II and III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

25. So as to avoid incurring a service level violation fee and so as to comport with the Walgreens' requirements for 95% "on time fill rate", and as part of the course of dealing and the course of performance of the parties, and with the actual knowledge, participation, understanding and agreement of Walgreens, Plaintiff, with the assistance of First Delta, would use the Reports supplied by Walgreens to "forecast" Walgreens' requirements for Goods and replenishment so as to enable Plaintiff to timely manufacture, produce and imported Goods from Asia for Walgreens.

**ANSWER:** The allegations of Paragraph 25 relate to Counts II and III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

26. As part of the parties' course of dealing and the course of performance, and by referring to the Walgreens' Reports, Plaintiff and Walgreens were able to forecast Walgreens' requirements for the inline Goods and replenishment.

**ANSWER:** The allegations of Paragraph 26 relate to Counts II and III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these

Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

27.     By relying on the Reports, inevitably and regularly followed Walgreens' purchase orders and replenishment orders, Plaintiff was able to conform to Walgreens' requirements for the timely delivery of the inline planogram products.

    <u>**ANSWER:**</u>    The allegations of Paragraph 27 relate to Counts II and III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

28.     Walgreens intended and knew Plaintiff was relying on the Reports supplied by Walgreens as forecasts to timely manufacture, produce and import Goods from Asia for Walgreens.

    <u>**ANSWER:**</u>    The allegations of Paragraph 28 relate to Counts II and III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

29.     For example, and annexed as ***Exhibit D*** to this Complaint, there are purchase orders for Goods (of the same or similar type subject of this action) where the date of the purchase orders precede the required delivery date by, in some instances, merely two weeks. The annexed purchase orders are next summarized:

| Order Number | Order Date | Ship Date |
|:---:|:---:|:---:|
| 01364990 | 02/10/2016 | 02/24/2016 |
| 17364990 | 02/10/2016 | 02/24/2016 |
| 18364990 | 02/10/2016 | 02/24/2016 |

    <u>**ANSWER:**</u>    The allegations of Paragraph 29 relate to Counts II and III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

30.     The **Exhibit D** purchase orders and the nominal lead time from the date of the purchase order to the date of delivery is evidence of the parties' course of dealing and the course of performance wherein and whereby each of Plaintiff and Walgreens relied on the preexisting forecast based on the Reports, Plaintiff to manufacture, produce and import the Goods from Asia for Walgreens, and Walgreens to plan its products and sales to its retail customers. Clearly, and but for the forecasts and Reports, Plaintiff could not have manufactured, produced and imported Goods from Asia to timely fill Walgreens' delivery requirements.

**ANSWER:**     The allegations of Paragraph 30 relate to Counts II and III of the

Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss

these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens

provides no answer here.

31.     In fact, the importance of the Reports as forecasts was further confirmed by (consistent with Walgreens' April 23, 2015 admission) a "Weekly Forecast Scorecard" report issued by Walgreens which contains forecast accuracy performance for all items for the previous five weeks.

**ANSWER:**     The allegations of Paragraph 31 relate to Counts II and III of the

Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss

these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens

provides no answer here.

32.     The weekly Reports reported on 88 criteria, including total forecast, total sales, total units, total forecast dollars, total sales dollars, total sales units, total forecast sales and total forecast to sales. A copy of a typical Walgreens' email enclosing a weekly scorecard report is annexed hereto and made a part hereof as **_Exhibit E_**.[1]

**ANSWER:**     The allegations of Paragraph 32 relate to Counts II and III of the Amended

Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these

Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides

no answer here.

33.     In other words, the Weekly Forecast Scorecard report compared actual sales of

---

[1] The Report attached as part of Exhibit E is 88 columns, and is attached hereto as an 11 page document read from left to right.

Plaintiffs' Goods at Walgreens to the forecasted sales, i.e. the sales of Plaintiff and Walgreens anticipated by the Reports. If Plaintiff's performance as against the forecast set forth in the Reports did not conform to the Reports, Plaintiff would be penalized, as set forth in Exhibit C to this Complaint.

**ANSWER:** The allegations of Paragraph 33 relate to Counts II and III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

34. Plaintiff was obligated to manufacture, import and deliver Goods to Walgreens consistent with the requirements set forth in the Reports and Walgreens was obligated to take in, accept and pay for the Goods subject of the Reports. This was the parties' Agreement, the established course of dealings and course of performance of the parties referred to in Exhibit 1 of the GTA at paragraph 4(c) (see Exhibit A annexed hereto).

**ANSWER:** The allegations of Paragraph 34 relate to Counts II and III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

## V.    THE GOOD NOT PAID FOR BY WALGREENS

### A. Walgreens Failed to Pay Invoiced Amounts for Goods Delivered

35. In or about April through June 2016, Plaintiff and Walgreens entered into agreements wherein Walgreens purchased consumer electronic accessories (collectively, the "Unpaid Goods") from Plaintiff.

**ANSWER:** Walgreens admits that it submitted purchase orders to LifeWorks for certain consumer electronic accessories in or about April through June 2016 pursuant to the Business Agreement and GTA. Walgreens denies that those purchase orders created or altered the terms of the Business Agreement and GTA, and denies the allegations of Paragraph 15 to the extent they suggest otherwise.

36.     Dansky, on behalf of Walgreens, ordered the Unpaid Goods from Plaintiff.

**ANSWER:**     Walgreens admits that Rori Dansky, as Category Manager, managed

Walgreens' relationship with LifeWorks, but denies that Ms. Dansky issued the related purchase

orders pursuant to the Business Agreement and the GTA.

37.     Plaintiff shipped the Unpaid Goods to Walgreens.

**ANSWER:**     Walgreens admits that LifeWorks shipped some goods to Walgreens, as

reflected by associated freight bills. Walgreens denies the allegations contained in Paragraph 17

to the extent that they purport to differ from those freight bills that Walgreens executed and

returned to LifeWorks after receiving any goods.

38.     Upon information and belief, Walgreens accepted delivery of the Unpaid Goods
and sold the Unpaid Goods in its retail store locations and online.

**ANSWER:**     Walgreens admits that it accepted some goods from LifeWorks, as

reflected by associated freight bills. Walgreens denies the allegations contained in Paragraph 18

to the extent that they purport to differ from any of those freight bills Walgreens executed and

returned to LifeWorks. Walgreens admits that some of the goods were sold by it, but denies that

the goods were sold pursuant to the terms of the parties' agreements. Answering further,

Walgreens states that many of the goods could not be sold in accord with the parties' agreements

and that LifeWorks refused to accept the return of those goods, pursuant to the Business

Agreement and GTA, forcing Walgreens to attempt to mitigate its damages by selling those

goods at a loss, as further alleged in Walgreens' Counterclaim.

39.     In or about April through July 2016, Plaintiff issued invoices for the Unpaid
Goods to Walgreens in the amount of $3,127,185.60.

**ANSWER:**     Walgreens lacks knowledge or information sufficient to form a belief

about the truth of the allegations contained in Paragraph 19 and so denies them. Answering

further, Walgreens states that any invoices for items not sold by Walgreens in accord with the Business Agreement and GTA were improper pursuant to those agreements.

40.     Walgreens made a partial payment on the invoices.

**ANSWER:**     Walgreens admits that it paid LifeWorks certain amounts, but lacks sufficient information concerning the referenced invoices to admit or deny the allegations of Paragraph 20 and so denies them. Answering further, Walgreens refers to its answers in Paragraphs 18 and 19.

41.     Despite receipt of the invoices, Walgreens has failed and refused to pay Plaintiff the amount of $1,285,432.27 for the Unpaid Goods, including amounts due for wrongful and improper deductions and credits, which amount remains due and owing to Plaintiff.

**ANSWER:**     Walgreens denies the allegations contained in Paragraph 21.

42.     Annexed hereto and made a part hereof as Exhibit F, is Plaintiff's Custom A/R Aging Detail as of March 7, 2017 showing a balance due of $813,747.09, which such sum together with amounts due Plaintiff for unauthorized chargebacks and deductions totaling $471,685.18 equals a total amount due and owing to Plaintiff from Walgreens of $1,285,432.27.

**ANSWER:**     Walgreens denies the allegations of Paragraph 42.

43.     Walgreens owes Plaintiff $1,285,432.27 for Goods sold and delivered to Walgreens by Lifeworks, no part of which has been paid although due demand has been made by Plaintiff to Walgreens.

**ANSWER:**     Walgreens denies the allegations of Paragraph 43.

**B.   Walgreens Failed to Accept Goods Manufactured Pursuant to the Agreements**

44.     In 2016, the parties, consistent with their course of dealings and course of performance and by and through various Reports and forecasts, agreed that Walgreens would purchase Goods from Plaintiff consistent with the Goods being inline planogram products (the "2016 Agreements").

**ANSWER:**     The allegations of Paragraph 44 relate to Counts II and III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

45.     The 2016 Agreements required Plaintiff to deliver Goods consistent with Plaintiffs' obligation to keep Walgreens shelves consistently stocked with the inline planogram products. To do that Plaintiff relied on the Walgreens 2015 Reports and the Walgreens 2016 Reports received by Plaintiff from Walgreens, consistent with the course of dealings and the course of performance of Plaintiff and Walgreens. Copies of certain of the 2015 Reports and 2016 Reports are annexed as ***Exhibit G*** and ***Exhibit H*** respectively.

**ANSWER:**     The allegations of Paragraph 45 relate to Counts II and III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

46.     In 2016, Walgreens knew and intended that Plaintiff would rely on the Reports to forecast and to manufacture, produce and import and, thereafter, sell Goods to Walgreens in 2016 (the "2016 Goods") and Plaintiff, in fact, did so rely.

**ANSWER:**     The allegations of Paragraph 46 relate to Counts II and III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

47.     Plaintiff was therefore obligated to manufacture, import and delivery goods to Walgreens consistent with the requirements set forth in the Reports and Walgreens was obligated to take in, accept and pay for the 2016 Goods subject of the Reports.

**ANSWER:**     The allegations of Paragraph 47 relate to Counts II and III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

48.     In compliance with the 2016 Agreements, Plaintiff caused to be manufactured and imported for Walgreens the 2016 Goods.

**ANSWER:**     The allegations of Paragraph 48 relate to Counts II and III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these

Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

49.     But in or about July 2016, Walgreens willfully, wrongfully and unjustifiably cancelled Walgreens remaining obligations to take in the 2016 Goods pursuant to the 2016 Agreements.

**ANSWER:**     The allegations of Paragraph 49 relate to Counts II and III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

50.     At the time of Walgreens wrongful cancelation of the 2016 Agreements, Plaintiff was left with approximately 228,045 units of 2016 Goods, with an invoice value of approximately $534,673.47, on hand. A schedule of that portion of 2016 Goods is annexed hereto as Exhibit I. In addition, and by reason of the 2016 Agreements based on the Reports annexed as Exhibits G and H, Walgreens was obligated to take in, accept and pay for an additional $2,000,000.00 in goods from Plaintiff.

**ANSWER:**     The allegations of Paragraph 50 relate to Counts II and III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

## VI.     CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT

51.     Plaintiff repeats, realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

**ANSWER:**     Walgreens repeats and realleges its answers to the allegations in the preceding paragraphs as if fully set forth herein.

52.     In or about April through June 2016, Plaintiff and Walgreens entered into an agreement (the "Agreement"), whereby Plaintiff agreed to sell and Walgreens agreed to purchase the Unpaid Goods in exchange for payment by Walgreens in the amount of $3,127,185.60.

**ANSWER:** Walgreens denies the allegations of Paragraph 52. Answering further, the Business Agreement and GTA set forth the terms and conditions under which the parties agreed to facilitate their purchase and sale transactions, and any purchase orders Walgreens made, including between and April and June 2016, were pursuant to the Business Agreement and GTA.

53. Plaintiff fully performed its obligations under the Agreement.

**ANSWER:** Walgreens denies the allegations of Paragraph 53.

54. Walgreens breached the Agreement by failing to pay the amount due of $1,285,432.27 as set forth on Exhibit F, inclusive of $471,685.18 for unauthorized chargebacks and deductions.

**ANSWER:** Walgreens denies the allegations of Paragraph 54.

55. By reason of the foregoing, Plaintiff is entitled to judgment against Walgreens in the amount of $1,285,432.27 together with interest.

**ANSWER:** Walgreens denies the allegations contained in Paragraph 55.

## COUNT II – BREACH OF CONTRACT

56. Plaintiff repeats, realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

**ANSWER:** The allegations of Paragraph 56 relate to Count II of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

57. In 2016, the Parties entered the 2016 Agreements.

**ANSWER:** The allegations of Paragraph 57 relate to Count II of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

58.     In accordance with 2016 Agreements, Plaintiff commenced manufacturing and manufactured the 2016 Goods for Walgreens.

**ANSWER:**     The allegations of Paragraph 58 relate to Count II of the Amended

Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these

Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides

no answer here.

59.     However, in or about July 2016, Walgreens willfully, wrongfully and unjustifiably cancelled the 2016 Agreements and refused to accept the balance of the 2016 Goods subject of the 2016 Agreements, leaving Plaintiff with a balance of the 2016 Goods on hand, namely 228,045 units with an invoice value of approximately $534,673.47.

**ANSWER:**     The allegations of Paragraph 59 relate to Count II of the Amended

Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these

Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides

no answer here.

60.     Plaintiff fully performed its obligations under the 2016 Agreements.

**ANSWER:**     The allegations of Paragraph 60 relate to Count II of the Amended

Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these

Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides

no answer here.

61.     Walgreens breached the 2016 Agreements by willfully, wrongfully and unjustifiably cancelling and refusing to accept the portion of the 2016 Goods as set forth on Exhibit I which were manufactured and imported by Plaintiff for Walgreens.

**ANSWER:**     The allegations of Paragraph 61 relate to Count II of the Amended

Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these

Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides

no answer here.

62. By reason of the foregoing, Plaintiff is entitled to judgment against Walgreens in the amount of $534,673.47, together with interest.

**ANSWER:** The allegations of Paragraph 62 relate to Count II of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

## COUNT III – BREACH OF CONTRACT

63. Plaintiff repeats, realleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

**ANSWER:** The allegations of Paragraph 63 relate to Count III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

64. Plaintiff fully performed its obligations under the Agreement.

**ANSWER:** The allegations of Paragraph 64 relate to Count III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

65. When Walgreens cancelled its 2016 Agreement to take in, accept and pay for the 2016 Goods that were the subject of the Reports and the forecast, Walgreens breached the 2016 Agreements by refusing to take in, accept and pay for the 2016 Goods subject of the 2016 Agreements.

**ANSWER:** The allegations of Paragraph 65 relate to Count III of the Amended Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides no answer here.

66.     By reason of the foregoing, Plaintiff is entitled to judgment against Walgreens in an amount as of yet undetermined but estimated to be not less than $2,000,000.00 for the additional Goods forecast through the Reports received by Plaintiff from Walgreens setting forth the Agreements of the parties and consistent with the course of dealings and course of performance.

**ANSWER:**     The allegations of Paragraph 66 relate to Count III of the Amended

Complaint. Walgreens has contemporaneously filed a Rule 12(b)(6) Motion to Dismiss these

Counts for the reasons set forth in its supporting memorandum. Therefore, Walgreens provides

no answer here.

## AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE
### (Set-Off)

To the extent LifeWorks has suffered any damages, such damages are subject to set-off,

because of the greater amounts that LifeWorks owes to Walgreens, as further set out in

Walgreens' Counterclaim against it.

## SECOND AFFIRMATIVE DEFENSE
### (Failure to Mitigate)

LifeWorks' claims fail in whole or in part because LifeWorks failed to take reasonable

steps to mitigate its alleged damages, if any, and its recovery must be barred or diminished

accordingly.

## THIRD AFFIRMATIVE DEFENSE
### (Unclean Hands)

LifeWorks' claims are barred by the equitable defense of unclean hands because

LifeWorks failed to abide by the parties' agreements as set forth in Walgreens' Counterclaim.

## ADDITIONAL DEFENSES

Walgreens has not completed its investigation and discovery regarding the facts alleged and causes of action asserted by LifeWorks. Accordingly, without admitting any obligation to do so, Walgreens reserves the right to assert such additional affirmative defenses as necessary based on such ongoing investigation and discovery.

## RESTATED COUNTERCLAIM AGAINST
## LIFEWORKS TECHNOLOGY GROUP LLC

Pursuant to Federal Rule of Civil Procedure 13, Walgreens states as follows for its Counterclaim against LifeWorks:

## I.      NATURE OF THE COUNTERCLAIM

1.      This is an action for breach of contract or, alternatively, for unjust enrichment. It arises from LifeWorks' breach of its promises and obligations pursuant to the parties' written contracts and course of dealing. LifeWorks breached its obligations pursuant to the Business Terms Agreement between the parties, dated February 18, 2013, and the Walgreen Co. General Trade and Electronic Data Interchange Agreement, dated February 19, 2013, both of which LifeWorks had signed and which agreements governed all of the transactions between the parties. LifeWorks breached these contracts willfully. It deliberately determined to make false statements about its then-present intent to Walgreens with the express purpose of inducing Walgreens: (a) not to terminate the parties' agreements; (b) to make additional orders from LifeWorks; and (c) to take additional steps to increase business for LifeWorks. As a direct and proximate cause of LifeWorks' breaches of contract and its false statements about its intent to breach, Walgreens has suffered damages in an amount to be proven at trial, but not less than $1,682.757. LifeWorks has been correspondingly unjustly enriched.

## II.      PARTIES

2.      Walgreens is an Illinois corporation with its principal place of business at 200 Wilmot, Road, Deerfield, IL 60015. Walgreens is in the business of providing consumer goods and services, as well as pharmacy, health and wellness services, through thousands of retail drugstores throughout the United States.

3.      LifeWorks is a New York limited liability company with its principal place of business at 530 7th Avenue, New York, NY 10018.

4.      LifeWorks is engaged in the business of designing, manufacturing and distributing consumer tech, fitness, and automotive accessories.

5.      On information and belief, including LifeWorks' own allegations in its Complaint against Walgreens, LifeWorks' membership is comprised of Harry Adjmi, Amin Adjmi, Eddie Mizrahi, Solomon Fallas and Max Namer, all of whom are citizens of New York and not Illinois.

### III.      <u>JURISDICTION AND VENUE</u>

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the citizenship of Walgreens and LifeWorks is diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      This Court additionally has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1367, because Walgreens' counterclaims are so related to the same transactions and occurrences as LifeWorks' complaint against Walgreens as to amount to a single case or controversy.

8.      Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) because Walgreens resides in this district and a substantial part of the events or omissions giving rise to the claims made in this lawsuit occurred within the Northern District of Illinois. Moreover, the parties "consent[e]d to the exclusive jurisdiction of the courts of the State of Illinois or Federal District Court of the Northern District of Illinois and agree[d] to waive all objections as to venue and *forum non conveniens*."

## IV.   FACTS

### A.   The Parties' Agreements

9.     Walgreens was introduced to LifeWorks by First Delta Group in 2012. First Delta Group is a manufacturer's consultancy and representation company. Between 2012 and 2016, First Delta Group acted as LifeWorks' agent and representative with Walgreens.

10.     In early 2013, Walgreens and LifeWorks agreed that Walgreens would buy various consumer electronic accessories from LifeWorks and stock those accessories at its stores for resale to consumers. Walgreens and LifeWorks agreed that these purchases by Walgreens would be pursuant to certain written agreements.

11.     The written agreement by which all subsequent purchases by Walgreens from LifeWorks were made was the Walgreen Co. General Trade and Electronic Data Interchange Agreement (the "GTA"). LifeWorks signed the GTA with an effective date of February 19, 2013. A copy of the GTA is attached hereto as Exhibit A.

12.     The GTA stated in its preamble that: "The terms and conditions contained herein shall apply to all merchandise … sold by Vendor [LifeWorks], directly or indirectly through its distributors, to Walgreen[s]."

13.     The GTA further provided in Section C(1) that: "Vendor's performance shall be in accordance with these terms, dating and conditions. Any other terms in Vendor's acceptance are rejected unless agreed to in writing and signed by Walgreen's authorized representative." Further clarifying that the GTA controlled the parties' relationship, the GTA further provided that: "In the event of a conflict between these terms or any purchase order issued by Walgreen[s], and any document issued by Vendor, the terms of this Agreement shall control." Ex. A, GTA § D(8). The GTA further provided that: "No oral modification or waiver of any provisions of this Agreement shall be binding on either party." *Id.* § F(2).

14.     The parties never signed any written modification of the GTA.

15.     Section C(2) of the GTA states that "if a purchase order is designated as 'Guaranteed Sale,' . . . Walgreen[s] shall not be obligated to pay for any merchandise until after it is sold by Walgreen[s] in accordance with terms agreed upon by the parties." *Id.* § C(2).

16.     Walgreens and LifeWorks also agreed to a Business Terms Agreement (the "Business Agreement"). The Business Agreement is on LifeWorks' letterhead and LifeWorks signed the Business Agreement with an effective date of February 18, 2013. A copy of the Business Agreement is attached hereto as Exhibit B. The Business Agreement includes a heading "Guaranteed Sale or Exit Strategy" and states that "[LifeWorks] agrees to a guaranteed sale on all products sold to Walgreens. [LifeWorks] understands that if the item does not meet Walgreens sales expectations, Walgreens will utilize the 'blanket' RA and send all remaining store and DC inventory back to [LifeWorks] and/or utilize a 50% of cost for markdown." Ex. B, Business Agreement at 1. "RA" in this sentence refers to "Return Agreement."

17.     Thus, all purchases by Walgreens from LifeWorks were on a "Guaranteed Sale" basis such that Walgreens was not obligated to pay for that merchandise until it was sold pursuant to agreed-upon terms. Moreover, by the terms of the GTA and the Business Agreement, if Walgreens' sales expectations were not met, Walgreens had a right to return the merchandise to LifeWorks (with no payment obligation having arisen) or sell the items at a 50% of cost markdown.

18.     Section C(2) of the GTA further states "…Walgreen[s] shall have the unrestricted right to rescind its purchase of the merchandise from [LifeWorks] both before and after acceptance of such merchandise by Walgreen[s]." Ex. A, GTA § C(2).

19.     Section C(4) of the GTA states that "[i]n the event that Walgreen[s] is entitled to credits, offsets or charge backs (collectively, "Credits") with respect to any transaction, Walgreen[s] may take such Credits against any amounts otherwise due to [LifeWorks] arising from or under any transaction between [LifeWorks] and Walgreen[s] . . ." *Id.* § C(4).

20.     Neither the GTA nor the Business Agreement had any term or termination date. Accordingly, both agreements were terminable at will.

**B.      The Parties' Course of Dealing**

21.     Starting in 2013, Walgreens began to purchase consumer electronic accessories from LifeWorks for resale pursuant to the GTA and Business Agreement.

22.     As the year neared an ending, LifeWorks agreed to accept returns from Walgreens of products that had not sold. This was necessary before Walgreens would order new products from LifeWorks. It was also consistent with the GTA and Business Agreement terms, as alleged above.

23.     This same course of conduct was repeated in 2014, with Walgreens returning unsold products, LifeWorks accepting those returns, and Walgreens then ordering new products from LifeWorks.

24.     In both 2013 and 2014, to the extent that Walgreens had been invoiced and paid for items that had not been sold, Walgreens exercised its right to credit or offset new amounts owed based on overpayments to LifeWorks.

25.     Throughout this period, First Delta Group acted as LifeWorks' agent and representative with Walgreens. This included specifically communicating directly with Walgreens in that capacity on behalf of LifeWorks.

**LifeWorks Breaches the GTA and Business Agreement and Lies About it in Order to Induce Additional Purchases by Walgreens**

26.     During 2015, a large quantity of LifeWorks' products that year did not sell at Walgreens' stores. As it did each year, Walgreens communicated to LifeWorks that it would return these unsold items consistent with its rights pursuant to the parties' agreements and the "Guaranteed Sale" nature of all the parties' transactions.

27.     First Delta Group informed LifeWorks that its agreement to this return was required before Walgreens would purchase the back-to-school merchandise or any other new product offerings from LifeWorks.

28.     As it had done throughout the parties' course of dealing, LifeWorks stated to Walgreens its intent to accept the return of older, unsold goods. LifeWorks first made this commitment late in 2015 to Walgreens' Category Manager Rori Dansky through its then national sales manager, David Chrem. At that time, Walgreens and LifeWorks were negotiating over valuable holiday season placement of LifeWorks' products at Walgreens' stores.

29.     LifeWorks repeated its commitment to accept the return of unsold goods during a meeting on or about February 25, 2016 that was attended by Rori Danksy, Tammi Halsema, from First Delta Group, and David Chrem. Mr. Chrem stated that LifeWorks would accept the return. Based on that representation, Walgreens agreed to purchase newer electronic accessories from LifeWorks as part of its back-to-school and general electronic accessory offerings for that year.

30.     LifeWorks' statements in late 2015 and February 2016 that it would accept the returns of unsold good that it was obligated to take by the Business Agreement and GTA were not true and Mr. Chrem knew that the statements were not true when he made them. In fact, LifeWorks had at the times of those statements decided that it would not accept the returns

because doing so would be too expensive, as Walgreens would then take an offset of any amounts it had paid for unsold product, consistent with the parties' agreements.

31.     LifeWorks' intent to renege on its agreement and obligation to accept returns of unsold items is reflected, for example, in an email written by Mr. Chrem at the time, but not shared then with Walgreens. For example, on December 2, 2015, Mr. Chrem wrote to Ms. Halsema that: "I know we told Rori we would take back [the unsold items] but with the holiday display fiasco, I don't think Eddie will want to do it as too much $$$. Let's get through the holiday display situation before we start another fire." Eddie refers to Eddie Mizrahi of LifeWorks. This email refers to LifeWorks' attempt to induce better holiday display placement of its products at Walgreens' stores by withholding information about its intent to breach the parties' agreements.

32.     In another email to Ms. Halsema, dated March 28, 2016, Mr. Chrem repeated LifeWorks' intent to breach the parties' agreements. In the context of discussion strategy to get Walgreens to order more products from LifeWorks, and responding to Ms. Halsema's inquiry whether LifeWorks was ultimately going to refuse to accept the returns, Mr. Chrem wrote: "Yes, bec[ause] the inventory levels [of unsold product] are high and the return of those 2 items would be over $1 million." LifeWorks did not share this intent with Walgreens at the time because it was simultaneously attempting to induce additional purchases of new products from Walgreens.

33.     When Walgreens realized that LifeWorks would refuse to comply with its obligations and the parties' agreements by accepting the returns of unsold products, it exercised its right under the Business Agreement to sell the products at a 50% markdown from cost. This was necessary to make room on the shelves for new inventory, including new inventory

purchased from LifeWorks based on the false and fraudulent premise, stated by Mr. Chrem, that LifeWorks would live up to its obligations by accepting the 2015 returns.

34.     While Walgreens' sale of the goods whose return LifeWorks refused at a 50% markdown from cost mitigated Walgreens' total damages, these sales nonetheless resulted in direct damages to Walgreens in an amount to be determined at trial, but not less than $1,682,757.

35.     First Delta Group refused to continue to represent LifeWorks after LifeWorks breached its obligations to Walgreens because of the unprofessional and dishonest manner of that conduct.

36.     Walgreens subsequently ceased doing business with LifeWorks, terminating the parties' agreements.

## V.     CAUSES OF ACTION

## COUNT I: BREACH OF CONTRACT

37.     Walgreens repeats and realleges the allegations set forth in paragraphs 1 – 36 as though set forth fully herein.

38.     The GTA is a valid and enforceable agreement.

39.     The Business Agreement is a valid and enforceable agreement.

40.     Walgreens fully complied with its obligations under the GTA and Business Agreement.

41.     LifeWorks breached the terms of the GTA and Business Agreement by refusing to accept the return of unsold merchandise. LifeWorks' actions forced Walgreens to mitigate its damages and sell the unsold merchandise at below cost.

42.     The marked-down sale of LifeWorks goods at below cost diverted purchasers from other full-price purchases and caused Walgreens additional consequential damages.

43.     LifeWorks' breaches proximately caused Walgreens' damages, in an amount to be proven at trial, not less than $1,682,757, plus additional, consequential damages.

**WHEREFORE,** Walgreens hereby requests that the Court enter judgment in its favor and against LifeWorks, awarding damages in an amount to be determined by the Court, plus pre-judgment interest, and such other relief as the Court deems just and proper.

## COUNT II: UNJUST ENRICHMENT

44.     Walgreens repeats and realleges the allegations set forth in paragraph 1 – 36 above as though set forth fully herein

45.     LifeWorks was obligated to accept the 2015 returns by the terms of the parties' agreements and by their course of dealings.

46.     LifeWorks falsely and fraudulently told Walgreens in late 2015 and again on February 25, 2016 that it would abide by its obligations and accept the returns of unsold 2015 inventory.

47.     LifeWorks knew when it made these statements that they were false statements of its intent and that, by its own admission, LifeWorks had no intention of accepting any returned goods because such a return would cost LifeWorks "over $1 million."

48.     Walgreens, however, relied on the truth of LifeWorks' statements, LifeWorks' agreement to the excess inventory return, and the parties' course of dealing when it subsequently agreed to purchase additional inventory from LifeWorks instead of terminating its agreement with LifeWorks.

49.     As a result of LifeWorks' fraudulent statements to Walgreens, and Walgreens' reliance on those statements, LifeWorks was unjustly enriched by virtue of avoiding repaying Walgreens for the unsold product, contrary to the parties' agreements, and further by profits from

additional sales it induced from Walgreens based on its false statements from December 2015 through at least March 2016.

50.     Allowing LifeWorks to retain the benefits of its own wrongdoing, which is at least $1,682,757, would violate the fundamental principles of justice, equity and good conscience.

**WHEREFORE,** Walgreens hereby requests that the Court enter judgment in its favor and against LifeWorks, awarding damages and/or disgorgement of unjust benefits in an amount to be determined by the Court, but not less than $1,682,757, plus pre-judgment interest, and such other relief as the Court deems just and proper.

## VI.     JURY DEMAND

Walgreens hereby demands a trial by jury, under Rule 38 of the Federal Rules of Civil Procedure, for all issues triable of right by a jury.

August 17, 2017                                Respectfully submitted,

                                            **WALGREEN CO.**


                                            By:    s/ Robert M. Andalman
                                                   One of its Attorneys



Robert M. Andalman (ARDC No. 6209454)
Candace Gaston Turner (ARDC No. 6325097)
A&G Law LLC
542 South Dearborn, 10th Floor
Chicago, IL  60605
Telephone: (312) 348-7629
Facsimile:  (312) 279-4529

## <u>CERTIFICATE OF SERVICE</u>

I, Robert M. Andalman, hereby certify that on August 17, 2017 I caused to be electronically filed the foregoing ***WALGREEN CO.'S ANSWER AND AFFIRMATIVE DEFENSES TO AMENDED COMPLAINT and RESTATED COUNTERCLAIM,*** true and correct copies of which will be served via the Court's EF/ECM system on all parties of record.


_____/s/ Robert M. Andalman_____