IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LifeWorks Technology Group LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-cv-03217 |
| | ) | |
| Walgreen Co., | ) | Honorable Gary Feinerman |
| | ) | |
| Defendant. | ) | Magistrate Judge Susan E. Cox |

**MEMORANDUM OF LAW IN OPPOSTION TO DEFENDANT WALGREEN CO.'S MOTION TO DISMISS COUNTS II AND III OF THE AMENDED COMPLAINT OF PLAINTIFF LIFEWORKS TECHNOLOGY GROUP LLC**

Plaintiff Lifeworks Technology Group LLC ("Plaintiff" or "Lifeworks"), respectfully submits this memorandum of law in opposition to Defendant Walgreen Co., ("Defendant" or "Walgreens") Motion to Dismiss Counts II and III of Plaintiff's Amended Complaint, dated August 3, 2017 (the "Complaint")(ECF #26) pursuant to Fed. R. Civ. P. 12(b)(6) (the "Motion").

### A. PRELIMINARY STATEMENT

Walgreens' Motion is premised on its claim that an enforceable "agreement" for the purchase of the 2016 Goods[1] between Lifeworks and Walgreens[2] did not exist.[3]

But it is undisputed and indisputable that from no later than February 19, 2013 and throughout the period in question, written contracts between the Parties for the purchase and sale of goods, namely the "GTA"[4] and the "BTA"[5] (collectively the "Contracts") existed.

The issue thus before the Court is not whether written Contracts for the purchase and sale of goods existed by and between the Parties, but rather whether the "Documents"[6] that do exist

---

[1] As defined in the Complaint.
[2] Collectively herein referred to as the "Parties"
[3] Walgreens does not deny that there was an agreement for the 2016 Goods. Walgreens disputes whether the agreements constitute a binding contract or a "Document" as defined by the GTA.
[4] General Trade and Electronic Data Interchange Agreement (Complaint at Ex A.)
[5] Business Terms Agreement (Complaint at Ex B)

and whether the course of dealings between the Parties are, as a matter of law, sufficient to allow Lifeworks to proceed on Counts II and II of the Complaint. For the reasons set forth herein, Lifeworks should be allowed to proceed and the Motion should be denied.

Walgreens' intransigent position that Walgreens had an absolute right to cancel orders before or after acceptance is incorrect, as is Walgreens' reliance on *ABB, Inc. v. Tate & Lyle Ingredients Americas, Inc.*, 2015 IL App (4th) 140201-U, ¶ 39, *appeal denied*, 32 N.E.3d 672 (Ill. 2015). *ABB, Inc.* does not stand for the proposition that Walgreens had the absolute right to rescind its agreement at any time; rather it stands only for the proposition that a party can contract to contractual remedies such as rescission when goods are nonconforming or when terms of purchase orders have not been met.

Moreover, Walgreens' interpretation of the GTA §(C)(2) purporting to allow Walgreens to terminate any purchase order at any time, for any reason, is contradicted by language in the very paragraph Walgreens relies upon. Walgreens' position that an absolute right to return exists under GTA §C(2) is further contradicted by Walgreens' reliance upon Ex B to Walgreens' Answer and Restated Counterclaims, dated August 17, 2017 (*See* ECF #30). If Walgreens correctly interprets §(C)(2) to mean that all goods can be returned, then Walgreens had no reason to incorporate the BTA into its contract document, as the cancellation right, if Walgreens had its way, would be built into the GTA. The BTA was required because otherwise there was no general right to return goods after acceptance. (To the extent that any such right exists it exists only as to "Pay on Scan"[7] goods.)

Additionally, Walgreens claims that no "Documents" exist in support of the 2016 Agreements. However, Walgreens' claim is contradicted. "Documents" is a defined term under

---

[6] As defined in Ex 1 to the GTA.
[7] Pay on scan means the suppliers maintain ownership of inventory within retailers' warehouses or stores until items are scanned at the point of sale to consumers. *See* https://en.wikipedia.org/wiki/Scan-based_trading

the electronic data interchange agreement, (Exhibit 1 to the GTA). Appendix A. provides a list of "Documents" and refers to a "Planning Schedule with Release Capability." Lifeworks *has attached* the 2015 and 2016 Reports as Exhibits G and H to its Complaint, each of which were utilized to forecast Walgreens' requirements for Goods. Lifeworks has also attached as Exhibit E to the Complaint "Weekly *Forecast* Scorecards,[8]" each of which were generated by Walgreens and were utilized to forecast sales.

The Appendix further refers to a "Product Transfer and Resale Report." Lifeworks *has attached* as Ex E to its Complaint the Weekly *Forecast* Scorecard, each of which were generated by Walgreens and were utilized to forecast sales and provided resale data. Exhibits E, G and H are in sum and substance the Documents Walgreens claims and must be provided credence.

Finally, contrary to the express terms of the GTA, which requires thirty days' notice to terminate the Parties' Contracts, Walgreens claims it had the right to terminate the Contracts at any time, for any reason, and therefore Walgreens effectively terminated the Contracts. However, Walgreens does not point to any documentary evidence which reflects that Walgreens provided the requisite thirty days' notice to Plaintiff. Accordingly, the GTA was not terminated prior to the entry of the 2016 Agreements and Walgreens' Motion to dismiss Counts II and III must be denied.

### B. STATEMENT OF FACTS

Plaintiff will rely on and incorporate herein by reference the facts as pleaded in Plaintiff's Complaint (ECF #26) and the exhibits annexed thereto. The pertinent facts can be summarized as follows:

---

[8] The Court should pay particular attention to the fact that the "Weekly *Forecast* Scorecard" is a denomination given to the document by the Walgreens Supply Chain.

Between 2012 and 2016, the Parties conducted business transactions with one another, wherein Walgreens ordered goods from Lifeworks.

The terms of the business transactions by and between Lifeworks and Walgreens were reflected in written agreements, including a Walgreen Co. GTA and, as applicable, the BTA, wherein "Vendor agree[s] to a guaranteed sale on all products sold to Walgreens contingent upon 60 day markdown strategy."

In addition to the terms of the written agreements, the Parties agreed that the conduct of Lifeworks and Walgreens would evidence a course of dealing and a course of performance accepted by the parties *in furtherance of their agreements and the transactions* by and between Lifeworks and Walgreens. Exhibit 1 to the GTA at paragraph 4 (c) specifically provided:

> "Conduct. *The conduct of the parties* pursuant to this Agreement, including the use of Signed Documents properly transmitted, *shall for all legal purposes, evidence a course of dealing and a course of performance accepted by the parties in furtherance of this Agreement*, and Transaction and any other written agreement described in Section 3(a)."

In fact, Walgreen's at ¶¶ 28, 29, 45, and 48 of Walgreens' Counterclaim interposes claims and defenses arising out of the Parties' course of dealing. In doing so, Walgreens concedes that the Parties' course of dealings shaped the Parties' transactions.

In accordance with the GTA, as part of the Parties' course of dealing and course of performance, and to facilitate Lifeworks' timely delivery of products manufactured, produced and imported from Asia for Walgreens, Walgreens would "forecast" to Lifeworks Walgreens' requirements for the consumer electronic accessories (the "Goods") Walgreens was ordering.

The forecasts communicated to Plaintiff were communicated long in advance of the required delivery date to enable Plaintiff to timely manufacture, produce and import goods from Asia for Walgreens. Moreover, such forecasts or "Planning Schedules" are provided for at GTA Exhibit 1, Appendix A.

By 2015, the Lifeworks' goods were "in line" items at Walgreens, included in Walgreens "planograms" (diagrams showing where retailers put products on shelves, racks and other store fixtures). Plaintiff, as the supplier, was required during and over the course of the year to consistently be in a position to immediately replenish the goods in the "planogram."

To assist Lifeworks with the forecasting of goods required by Walgreens, Walgreens regularly issued detailed spreadsheet reports to Lifeworks showing, among other things, weekly sell through and inventory, month to date sales, and comparison of a current year's sales to prior year's sales. (the "Reports"). As part of the course of dealing and the course of performance of the parties, and with the actual knowledge, participation, understanding and agreement of Walgreens, Plaintiff would use the Reports supplied by Walgreens to "forecast" Walgreens' requirements for goods and replenishment, so as to enable Plaintiff to timely manufacture, produce and imported goods from Asia for Walgreens. If the goods were untimely, Plaintiff would be assessed a "service level violation fee" to compensate Walgreens for service interruptions.

By relying on the Reports, inevitably and regularly following Walgreens' purchase orders and replenishment orders, Plaintiff was able to conform to Walgreens' requirements for the timely delivery of the inline planogram products. Without such Report, Plaintiff's goods would not be delivered to Walgreens, whose actual purchase orders were provided, in many cases, a mere two weeks in advance of a delivery date. (See Complaint at *Ex D*.)

Walgreens intended and knew Lifeworks was relying on the Reports supplied by Walgreens as forecasts to timely manufacture, produce and import goods from Asia for Walgreens. (See Complaint at *Ex D*.)

The importance of the Reports as forecasts was further confirmed by (consistent with Walgreens' April 23, 2015 admission) a "Weekly Forecast Scorecard" report issued by Walgreens, which contains forecast accuracy performance for all items for the previous five

weeks. The Weekly Forecast Scorecard report compared actual sales of Plaintiff's goods at Walgreens to the forecasted sales, i.e. the sales of Lifeworks and Walgreens anticipated by the Reports. If Plaintiff's performance as against the forecast set forth in the Reports did not conform to the Reports, Plaintiff would be penalized (Complaint at Exhibit C). Moreover, such scorecards are listed as a Document at GTA Exhibit 1, Appendix A., namely "Product Transfer and Resale Reports".

In 2016, Walgreens knew and intended that Plaintiff would rely on the Reports to forecast and to manufacture, produce and import and, thereafter, sell Goods to Walgreens in 2016 (the "2016 Goods") and Plaintiff, in fact, did so rely.

Plaintiff was obligated to manufacture, import and deliver the 2016 Goods to Walgreens consistent with the requirements set forth in the 2015 and 2016 Reports (Exhibits G and H respectively) and Walgreens was obligated to take in, accept and pay for the Goods subject of the Reports.

However, in or about July 2016, Walgreens willfully, wrongfully and unjustifiably cancelled Walgreens remaining obligations to take in the 2016 Goods pursuant to the 2016 Agreements. Plaintiff was left with approximately 228,045 units of 2016 Goods, with an invoice value of approximately $534,673.47, on hand. In addition, and by reason of the 2016 Agreements based on the Reports annexed as Exhibits G and H to the Complaint, Walgreens was obligated to take in, accept and pay for an additional $2,000,000.00 in goods from Plaintiff.

### C. ARGUMENT

#### 1. Legal Standard on a Motion to Dismiss

"The purpose of a 12(b)(6) motion is to decide the adequacy of the complaint, not to determine the merits of the case." *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). "In ruling on a motion to dismiss, the court must construe the allegations of the

complaint in the light most favorable to the plaintiff, and all well-pleaded facts and allegations in the complaint must be accepted as true." *Bontkowsi v. First Nat'l Bank of Cicero*, 998 F.2d 459, 461 (7th Cir.1993). A complaint need only allege "enough facts to state a claim for relief that is plausible on its face." *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 557 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1959 (2009). To that end, all that is required is that "…the plaintiff must include enough details about the subject-matter of the case to present a story that holds together." *Haywood v. Chicago Hous. Auth.*, 212 F. Supp. 3d 735, 751–52 (N.D. Ill. 2016) (internal citations omitted).

On a motion to dismiss, "[t]he facts are set forth as favorably to Plaintiff as permitted by the materials relied on." *Nguyen v Patek*, No. 14 C 1503, 2014 WL 5293425, at *1 (N.D. Ill. Oct. 16, 2014). "In setting forth those facts on a motion to dismiss, the court does not vouch for their accuracy." *Haywood v. Chicago Hous. Auth.*, 212 F. Supp. 3d 735, 739 (N.D. Ill. 2016) (internal citations omitted).

### 2. **The GTA, BTA and Course of Dealing Established a Contract by which the Parties were Bound**

It is undisputed that Lifeworks and Walgreens entered into the GTA and BTA (Complaint at Exhibits A and B respectively). The discrepancy lies in the Parties' interpretation of the Contracts and to what extent the Parties' course of dealings governs the Parties' transactions.

As stated in the GTA §4, *the conduct of the parties* "…*shall for all legal purposes, evidence a course of dealing* and a course of performance *accepted by the parties* in furtherance of this Agreement...".

Here, as evidenced by both Parties' admissions in their respective pleadings, the Parties' course of performance further defined the express terms of the GTA. "[A]n admission under section 408.319(4) need not expressly acknowledge the existence of a contract, nor need it describe all of its terms." *Gruen Indus., Inc. v. Biller*, 608 F.2d 274, 278 (7th Cir. 1979), citing *Dangerfield v. Markel*, 222 N.W.2d 373 (N.D.1974) (applying the statute of frauds for sales of goods, section 2-201(3)(b) of the UCC). "The admission need only describe conduct or circumstances from which the trier of fact can infer a contract." *Gruen Indus.*, 608 F.2d at 278 (citing *Packwood Elevator Co. v. Heisdorffer*, 260 N.W.2d 543, 546 (Iowa 1977)).

Similarly, a leading treatise advises:

Dismissal should not be granted where controversy appears to relate, not to the facts themselves, but rather to their implications or to the applicable rule of law. ***If the defendant, though denying having entered a "contract," admits facts which may reasonably be held to verify plaintiff's allegations, the statutory defense should be barred, even though reasonable persons might differ as to the meaning of the facts admitted.*** Corbin on Contracts § 14.2[4].

In this case, Walgreens relied on the Parties' course of dealing in support of its counterclaims (Answer at ¶¶28, 29, 45 and 48). Moreover, the GTA expressly provides the right to rely on the course of dealings in furtherance of the GTA. Yet when Lifeworks asserts the course of dealing as part of the Parties' Contracts, Walgreens objects. Walgreens cannot choose to rely on the course of dealing when it suits Walgreens' purposes and reject it when, as here, it is asserted by Lifeworks contrary to Walgreens' litigation position. In accordance with GTA §4(c), the course of dealing must be relied on to further define the Parties' various agreements.

As set forth in *K's Mdse. Mart, Inc. v Northgate Ltd. Partnership*, 359 Ill.App.3d 1137 (4th Dist. 2005):

> "[T]he best way to interpret a contract is to give it the meaning the parties have given it. In cases involving the sale of goods, course of dealing, usage of trade, and course of performance may be considered to explain or supplement the terms of an agreement even without a determination that the agreement is ambiguous."

*Id.* at 1144 (citing 810 ILCS Ann. 5/2–202, Uniform Commercial Code Comment (1)(a), at 95 (Smith–Hurd 1993)).

Additionally,

> "Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement. The parties to an agreement are in the best position to know what they meant, and their action under the contract is often the strongest evidence of their intended meaning."

*Chicago & N. W. Ry. Co. v. Peoria & Pekin Union Ry. Co.*, 46 Ill.App.3d 95, 101 (3rd Dist.).

Under the course of dealings analysis, upon receipt and review of the Walgreens' Reports, Lifeworks was obligated to manufacture, import and deliver Goods to Walgreens consistent with the requirements set forth in the Reports and Walgreens was obligated to take in, accept and pay for the Goods subject of the Reports.

By relying on the Reports, inevitably and regularly following Walgreens' purchase orders and replenishment orders, Plaintiff could conform to Walgreens' requirements for the timely delivery of the inline planogram products. Without such Report, Plaintiff's goods would not be delivered to Walgreens, whose actual purchase orders were provided, in many cases, a mere two weeks in advance of a delivery date.

By reason of the 2015 and 2016 Reports, (Complaint at ***Exhibits G and H***), Plaintiff manufactured and was left with approximately 228,045 units of 2016 Goods, with an invoice value of approximately $534,673.47, on hand. In addition, and by reason of the 2016

Agreements based on the Reports annexed as Exhibits G and H to the Complaint, Walgreens was obligated to take in, accept and pay for an additional $2,000,000.00 in goods from Plaintiff.

To the extent Walgreens disagrees with this analysis, that is an issue of fact which cannot be determined on a motion to dismiss. Rather, discovery must be exchanged to uncover to what extent the 2015-2016 Reports delivered to Lifeworks, obligated Walgreens to accept the 2016 Goods.[9]

### 3. Count II and III are in Accordance with the GTA, BTA and the Admitted Course of Dealings between the Parties

Walgreens' Motion, relies in large part on §C(2) of the GTA, which states:

*Walgreen may return, at Vendor's expense, cancel a purchase order and receive a full refund for all merchandise in excess of that ordered or which is defective or tainted or which varies from the sample from which or specifications for which the purchase order was placed, or for Vendor's failure to comply with Walgreen's shipping or billing directions or with these terms including, without limitation, the representations and warranties contained herein*. In addition to Walgreen's rights at law or in equity, Walgreen reserves the right to return at Vendor's expense any merchandise, cancel the purchase order and receive a full refund, where a claim is made that the use or resale of the merchandise by Walgreen infringes any alleged patent, trademark or copyright rights. In addition, if a purchase order is designated as a "Guaranteed Sale," "Sale and Return," "Sale or Return," "Consignment'" "Pay on Scan" or "Vendor Returnable" transaction, Walgreen shall not be obligated to pay for any merchandise until after it is sold by Walgreen in accordance with terms agreed upon by the parties. **For purposes of this Agreement, the term "Pay on Scan'' shall mean that Vendor shall retain title to the merchandise until Walgreen has sold such merchandise, and payment for such merchandise shall not be due and owing by Walgreen to Vendor until after such time, as is agreed upon by the parties. <u>In addition, Walgreen shall have the unrestricted right to rescind its purchase of the merchandise from Vendor both before and after acceptance of such merchandise by Walgreen</u>**. Vendor hereby grants to Walgreen a security interest in merchandise covered under this Agreement. The risk of loss with respect to said merchandise shall pass to Vendor upon delivery of the same to the carrier for return to Vendor. (emphasis added).

---

[9] Walgreen's likens this case to *Donald J. Ulrich Assocs. v. Tec Air, Inc.,* 15-CV-00657, 2016 WL 7374236, at *3 (N.D. Ill. Dec. 20, 2016). However, *Donald J. Ulrich Assocs.* is inapposite. On motion for summary judgment, the Court found that a commissioned employee could not receive damages for "anticipated future sales" as the sales had yet to occur and the employer had not yet breached the Agreement by withholding commissions on future sales. *Id.* at 2016 WL 7374236, at *3. Here the damages are not associated with any anticipated future sales but accumulate from Walgreens reluctance to accept goods specifically manufactured for Walgreens.

Walgreens interprets the underlined portion at §C(2) to mean that Walgreens could return any and all goods to Lifeworks at any time. However, to interpret this paragraph as Walgreens urges requires the italicized portion of §C(2) to be rendered surplusage.

It is a cardinal principle of contract interpretation that every provision must be given a meaning and that no provision should be construed as redundant or unnecessary. "Courts will not interpret a contract in a manner that would nullify or render provisions meaningless[.]" *Fid. Nat. Tit. Ins. Co. of New York v. Westhaven Properties Partnership*, 386 Ill.App.3d 201, 214 (1st. Dist. 2007), *citing Regency Commercial Assoc., LLC v. Lopax, Inc.*, 373 Ill.App.3d 270, 276 (4th Dist. 2007).

The plain meaning of the above section requires that the underlined sentence, allowing Walgreens the unrestricted right to rescind its purchases, refer only to "Pay on Scan" goods. If the unrestricted right were truly an unrestricted right applicable to all goods and all purchases under the GTA, then the first sentence at §C(2) would be rendered meaningless. Moreover, Walgreens' flawed interpretation of §C(2), would render meaningless the terms of the BTA. Walgreens would not require a separate document to discuss guaranteed sales if the GTA provided for an absolute right of return. (*See* Complaint at *Ex B*)(*See* also the Answer at *Ex. B*).

Furthermore, Walgreens' reliance on *ABB, Inc.*, 2015 IL App (4th) 140201-U, ¶ 39 in support of its position that Walgreens had an unrestricted right to rescind purchase orders is misplaced. In *ABB, Inc.,* the parties' agreement provided that Tate & Lyle were free to rescind the contract if ABB failed to comply with any of the terms of the contract. As the Court noted, "ABB failed to comply with those requirements, as evidenced by the failed sound test, the failed voltage test, and the failure to ship the transformer in a timely manner. Thus, Tate & Lyle was well within its rights under the contract to exercise the remedy of rescission." *Id.*

Here, Walgreens does not allege that Lifeworks failed to comply with the Parties' agreements at any point in time. Moreover, and as discussed, the GTA does not provide Walgreens with an unrestricted right to rescind *all purchase orders*. The right to rescind was specific to 'Pay on Scan' goods. (See Ex A to the Complaint, GTA §C(2). Neither party contends that the 2016 Goods were 'Pay on Scan' goods.

Accordingly, Walgreens' interpretation of the GTA §C(2) cannot be afforded any weight and the Motion, in as much as it relies on Walgreens' interpretation of GTA §C(2), must be denied.

**4.    The Documents in Support of the Parties' Agreements are Annexed to the Complaint**

Walgreens claims that no "Documents" exist in support of the 2016 Agreements. However, Walgreens' claim is contradicted by the exhibits to Plaintiff's Complaint.

"Documents" is a defined term under the terms and conditions of the electronic data interchange agreement, (Exhibit 1 to the GTA). The GTA at appendix A provides a list of "Documents."

Appendix A references a "Planning Schedule with Release Capability." Lifeworks "has attached" the 2015 and 2016 Reports as Exhibits G and H to its Complaint, each of which were generated by Walgreens to provide Lifeworks with a planning schedule of Walgreens' requirements for Goods.

Appendix A further refers to a "Product Transfer and Resale Report." Lifeworks "has attached" as Ex E to its Complaint the Weekly Forecast Scorecard which were generated by Walgreens and forecasted sales and provided a report of Walgreens' actual sales.

Exhibits E, G and H are in sum and substance the Documents Walgreens claims do not exist and must be provided credence.

### 5. Termination of the GTA

Further, Walgreens' motion to dismiss must be denied in light of the Parties "Terms and Conditions of Electronic Data Interchange," which governed the facilitation of the Parties "Transactions" (as defined therein) and was incorporated by reference into the GTA. Specifically, the Terms and Conditions promised as follows:

> "Term. This Agreement shall remain in effect until terminated by either party ***on thirty (30) days' prior written notice***, which notice shall specify the effective date of termination; provided, however, that any termination shall not affect the respective obligations or rights of the parties arising under any Documents or otherwise under this Agreement prior to the effective date of termination." (See Ex A to the Complaint at Exhibit 1 titled "Terms and Conditions of Electronic Data Interchange")

The specific agreements that controlled the facilitation of purchase and sale transactions were required to be terminated on 30 days prior written notice. Such notice was not given no earlier than March 15, 2017. Prior to March 15, 2017,[10] Walgreens never specified that the 2015 and 2016 Reports relied upon were "terminated."

To the extent that Walgreens will continue to argue there was no breach by Walgreens because the GTA had terminated at and by the will of Walgreens, the termination date must be determined during discovery in the action. The Illinois Supreme Court has held that generally, contracts lacking duration terms are terminable at will by either party. *Jespersen v. Minnesota Min. & Mfg. Co.,* 700 N.E.2d 1014, 1016 (1998). However, there are exceptions to that rule. In *Carrico v. Delp,* an Illinois appellate court recognized that "when a period of duration can fairly be implied from the nature of the contract," the law will supply a reasonable time. 141 Ill.App.3d 684, 690 (4th Dist.1986). "In *First Nat. Bank of Cicero v. Sylvester,* another Illinois appellate court interpreted *Carrico* to mean that the exception to the general rule is appropriate 'when

---

[10] There is documentary evidence that Walgreens wished to terminate the Parties' Contracts in or about March 15, 2017, when it advised Lifeworks that it will no longer carry Lifeworks merchandise in its stores.

consideration for a promise requiring continuing performance has been partly executed.' 196 Ill.App.3d 902, (1st Dist.1990)." *Polyad Co. v. Indopco Inc.*, 06 C 5732, 2007 WL 2893638, at *7 (N.D. Ill. Sept. 25, 2007).

Here, similar to placing reliance on an open line of credit, Lifeworks in reliance on Walgreens' 2015 and 2016 Reports, manufactured and was prepared to supply Walgreens with the 2016 Goods. Lifeworks would not have been able to supply the 2016 Goods in the time frame allotted if it did not rely on the Reports and the forecasts.

Accordingly, Walgreens' argument that the Parties' Contracts were terminated (on a date not set forth in any documentary evidence annexed to the Motion) is improper and must be denied.

### D. CONCLUSION

For all of the foregoing reasons, Defendant's Motion to Dismiss should be denied in its entirety.

Dated: September 19, 2017

LifeWorks Technology Group LLC

*/s/ Harlan M. Lazarus*
Harlan M. Lazarus, Esq.
LAZARUS & LAZARUS, P.C.
240 Madison Avenue, 8th Floor
New York, New York 10016
Tel: (212) 889-7400
hlazarus@lazarusandlazarus.com

*Admitted Pro Hac Vice*

Steven B. Towbin (ARDC No. 2848546)
Allison B. Hudson (ARDC No. 6313079)
SHAW FISHMAN GLANTZ & TOWBIN LLC
321 North Clark Street, Suite 800
Chicago, Illinois 60654
Tel: (312) 541-0151
stowbin@shawfishman.com
ahudson@shawishman.com

*Local Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

Allison B. Hudson, an attorney, hereby certifies that she caused a copy of the foregoing **MEMORANDUM OF LAW IN OPPOSTION TO DEFENDANT WALGREEN CO.'S MOTION TO DISMISS COUNTS II AND III OF THE AMENDED COMPLAINT OF PLAINTIFF LIFEWORKS TECHNOLOGY GROUP LLC**, upon the attached Electronic Mail Notice List through the ECF System and on the attached Service List in the manner so indicated on this 19th day of September, 2017.

*/s/ Allison B. Hudson*

**CM/ECF Email Notice List for Case 17-cv-03217:**

The following is the list of parties who are currently on the list to receive email notice/service for this case.

- **Robert M. Andalman**
  randalman@aandglaw.com,ldavlin@aandglaw.com,edavis@aandglaw.com
- **Carrie E. Davenport**
  cdavenport@shawfishman.com
- **Allison Hudson**
  ahudson@shawfishman.com,lgonzalez@shawfishman.com
- **Harlan M. Lazarus**
  hlazarus@lazarusandlazarus.com,ysutton@lazarusandlazarus.com
- **Steven Bennett Towbin**
  stowbin@shawfishman.com, cknez@shawfishman.com
- **Candace Gaston Turner**
  cturner@aandglaw.com,ldavlin@aandglaw.com,edavis@aandglaw.com

{12122-001 BRF A0485280.DOCX 4}