UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LIFEWORKS TECHNOLOGY GROUP LLC, | ) | |
| | ) | |
| Plaintiff, | ) | 17 C 3217 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| WALGREEN CO., | ) | |
| | ) | |
| Defendant. | ) | |

**M<small>EMORANDUM</small> O<small>PINION AND</small> O<small>RDER</small>**

LifeWorks Technology Group LLC alleges in this diversity suit that Walgreen Co. breached in various ways contracts under which LifeWorks provided goods for sale at Walgreen's retail stores. Doc. 26. Walgreen moves to dismiss in part the operative complaint under Federal Rule of Civil Procedure 12(b)(6). Doc. 27. The motion is granted.

**Background**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in LifeWorks's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019-20 (7th Cir. 2013). The facts are set forth as favorably to LifeWorks as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth those facts at the pleading stage,

1

the court does not vouch for their accuracy. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384 (7th Cir. 2010).

LifeWorks is an electronics and fitness accessory importer and wholesaler. Doc. 26 at ¶ 11. Between 2012 and 2016, Walgreen—which operates a large pharmacy store chain—ordered goods from LifeWorks to be sold at Walgreen's stores. *Id*. at ¶¶ 12-15. The terms governing the transactions were set forth in two contracts: the General Trade and Electronic Data Interchange Agreement ("GTA"), and the Business Terms Agreement ("BTA"). *Id*. at ¶ 15; Doc. 26-1 at 2-15; Doc. 35 at 1, 4, 7.

The GTA provides that its terms, "together with all attachments and exhibits attached hereto, by and between Walgreen and Vendor [LifeWorks] sets forth the terms and conditions under which the parties agree to facilitate their purchase and sale transactions." Doc. 26-1 at 3. The GTA further provides that, with certain exceptions not relevant here, "[t]he terms and conditions contained [in the GTA] shall apply to all merchandise … sold by Vendor [LifeWorks] … to Walgreen." *Ibid*. The BTA sets forth several supplementary terms, including insurance requirements, limitations on the use of Walgreen's trademarks, and—as relevant here—an agreement that "all products sold to Walgreens" would be made on a "guaranteed sale" basis, which, under the GTA, enabled Walgreen to pay LifeWorks only after selling the goods to its retail customers. *Id*. at 3, 14. Additional terms of both contracts are referenced below in the Discussion section. Neither the GTA nor the BTA specifies a quantity of goods that Walgreen would or was required to order from LifeWorks.

LifeWorks performed its obligations under the contracts, timely producing the ordered goods pursuant to certain forecasts made by Walgreen. Doc. 26 at ¶ 19. Walgreen provided those forecasts to LifeWorks long in advance of the required delivery date, and LifeWorks, in

2

turn, relied on the forecasts to conform to Walgreen's requirements for timely production and delivery. *Id*. at ¶¶ 20, 25, 27.

In July 2016, however, Walgreen cancelled its remaining orders, leaving LifeWorks with approximately 228,045 unsold units worth approximately $534,674. *Id*. at ¶¶ 49-50. In addition, Walgreen's cancellation meant that it would not pay for an as-yet-undetermined quantity of goods that LifeWorks expected to produce and import for sale at Walgreen's stores during the remainder of 2016. *Id*. at ¶¶ 45-50. LifeWorks estimates that those goods would have been valued at approximately $2 million. *Id*. at ¶ 50.

Shortly after Walgreen's cancellation of its remaining orders, LifeWorks filed this suit. Doc. 1. After Walgreen moved for partial dismissal of the complaint, Doc. 18, LifeWorks filed an amended complaint, Doc. 26. The amended complaint has three counts. Count I alleges that Walgreen breached the parties' contracts by underpaying LifeWorks in the amount of $1,285,432.27 (plus interest), in part by taking $471,685.18 in "unauthorized chargebacks and deductions." *Id*. at ¶¶ 51-55. Counts II and III allege that Walgreen breached the parties' contracts by canceling orders for goods that LifeWorks had either already produced or planned to produce in 2016. *Id*. at ¶¶ 56-66. Walgreen seeks dismissal only of Counts II and III.

## Discussion

The GTA's choice of law provision points to Illinois law, Doc. 26-1 at 5, and, in any event, the parties agree that Illinois law governs, Doc. 28 at 3; Doc. 35 at 11, 13. The court therefore applies Illinois law. *See Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 704-05 (7th Cir. 2004) (noting that, "[i]n a diversity case, the federal court must apply the choice of law rules of the forum state to determine applicable substantive law," and that "Illinois respects a contract's

choice-of-law clause so long as the contract is valid and the law chosen is not contrary to Illinois's fundamental public policy").

"The basic rules of contract interpretation under Illinois law are well settled. In construing a contract, the primary objective is to give effect to the intention of the parties." *Right Field Rooftops, LLC v. Chi. Cubs Baseball Club, LLC*, 870 F.3d 682, 689-90 (7th Cir. 2017). "A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Id*. at 690 (quoting *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007)). "Moreover, because words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others." *Gallagher*, 874 N.E.2d at 58. "If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning." *Right Field Rooftops,* 870 F.3d at 690 (quoting *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004)). By contrast, "[i]f the language of the contract is susceptible to more than one meaning, it is ambiguous," and in that event "a court may consider extrinsic evidence to ascertain the parties' intent." *Gallagher*, 874 N.E.2d at 58.

Section C(2) of the GTA states:

> Walgreen may return, at Vendor's expense, cancel a purchase order and receive a full refund for all merchandise in excess of that ordered or which is defective or tainted or which varies from the sample from which or specifications for which the purchase order was placed, or for Vendor's failure to comply with Walgreen's shipping or billing directions or with these terms including, without limitation, the representations and warranties contained herein. *In addition* to Walgreen's rights at law or in equity, Walgreen reserves the right to return at Vendor's expense any merchandise, cancel the purchase order and receive a full refund, where a claim is made that the use or resale of the merchandise by Walgreen infringes any alleged patent, trademark or copyright rights. *In addition*, if a purchase order is designated as a "Guaranteed Sale," "Sale and Return," "Sale or Return," "Consignment," "Pay on Scan," or "Vendor Returnable" transaction, Walgreen shall not be obligated to pay for any merchandise until after it is sold by Walgreen in

4

> accordance with terms agreed upon by the parties. For purposes of this Agreement, the term "Pay on Scan" shall mean that Vendor shall retain title to the merchandise until Walgreen has sold such merchandise, and payment for such merchandise shall not be due and owing by Walgreen to Vendor until after such time, as is agreed upon by the parties. *In addition, Walgreen shall have the unrestricted right to rescind its purchase of the merchandise from Vendor both before and after acceptance of such merchandise by Walgreen.*
> … .

Doc. 26-1 at 3 (emphasis added). Walgreen contends that the highlighted sentence that includes and follows the third "In addition"—which will be called the rescission provision—unambiguously allowed it to cancel its outstanding orders from LifeWorks, regardless of whether the goods had already been produced. Doc. 28 at 11-13. LifeWorks responds that the rescission provision applies only to "Pay on Scan" goods; if that is right, then the provision does not apply here, as it is undisputed that, pursuant to the BTA, the goods that LifeWorks contracted to sell to Walgreen were "Guaranteed Sale" goods, not "Pay on Scan" goods. Doc. 26-1 at 14; Doc. 28 at 3, 11; Doc. 35 at 4, 11-12; Doc. 36 at 3. LifeWorks adds that accepting Walgreen's reading of the rescission provision would improperly render superfluous both the first sentence of Section C(2)—which will be called the return provision—and the BTA. Doc. 35 at 11.

Walgreen's interpretation prevails, for understood in the context of the contracts as a whole, the rescission provision unambiguously contemplates a cancellation like the one Walgreen implemented here. Read most naturally, that provision—which, as noted, grants Walgreen an "unrestricted right to rescind its purchase of the merchandise from Vendor"—sets forth a standalone right to rescind, without prior notice, the purchase of any merchandise covered by the GTA. *See Allergease, Inc. v. Walgreen Co.*, 2017 WL 66819, at *3-4 (N.D. Ill. Jan. 6, 2017) (construing a similar provision to "provide Walgreens with the unrestricted right to rescind its purchase orders"); *see also ABB, Inc. v. Tate & Lyle Ingredients Americas, Inc.*, 2015 IL App (4th) 140201-U, ¶ 38 (noting the absence of authority "limit[ing] the ability of courts to enforce"

5

a negotiated rescission provision, particularly where "two well-established corporations engaged in arms'-length negotiations" are involved). This is so for the following reasons.

Section C(2) uses the phrase "in addition" three times. Each "in addition" introduces what is, in effect, a different subsection in Section C(2) designed to deal with a discrete scenario. The text preceding the first "in addition" establishes the first substantive right granted in Section C(2), permitting Walgreen to return defective, excess, or nonconforming goods at LifeWorks's expense. The text following the first "in addition" and preceding the second "in addition" concerns an entirely different situation: Walgreen's right to return merchandise at LifeWorks's expense "where a claim is made that the use or resale of the merchandise by Walgreen infringes" a non-party's intellectual property rights. The text following the second "in addition" and preceding the third "in addition"—which will be called the designated purchase order provision—addresses still a third scenario, stating that, for "Guaranteed Sale," "Pay on Scan," and four other categories of purchase orders, Walgreen "shall not be obligated to pay for any merchandise until after it is sold by Walgreen."

The text following the third "in addition" is the rescission provision. Here, too, the phrase "[i]n addition" serves, much like a subheading, to set off the rescission provision from the text following the second "in addition." Consequently, the third "in addition," much like the term "moreover" would have done, indicates that what follows is a separate and independent right granted by the GTA—the absolute right to rescind a purchase order. *See XPO Logistics Worldwide Gov't Servs., LLC v. United States*, 133 Fed. Cl. 162, 183 (2017) ("The phrase 'in addition' *is used to transition* from a discussion of how price would be evaluated for completeness, reasonableness, and fairness, to a discussion of how the agency would compare the proposals for purposes of making the contract award—*i.e.*, through calculation and

comparison of the TEPs.") (emphasis added); *Ankofski v. M&O Mktg., Inc.*, 218 F. Supp. 3d 547, 552 (E.D. Mich. 2016) ("Defendants argue that this language was intended merely to state that Plaintiff was an at-will employee. But the Agreement says that Plaintiff is an at-will employee in the very next sentence, and starts that sentence with the word 'moreover'—thus suggesting that the declaration that the employment relationship was 'at-will' was a separate and additional point, independent from the previous statement which proclaimed the parties' intent that the Agreement was 'not intended to be' and 'shall not be interpreted as' an employment contract."); *Encyclopaedia Britannica, Inc. v. Guerrero*, 598 F. Supp. 2d 849, 854 (N.D. Ill. 2009) ("[T]he phrase 'in addition to' in Section 7.1 differentiates Plaintiff's purchase rights following an early termination for cause from Plaintiff's purchase rights that accrue after the parties have performed their contract for several years.").

Pressing the opposite view, LifeWorks argues that the rescission provision's placement immediately after Section C(2)'s definition of "Pay on Scan" goods means that the rescission provision is limited to "Pay on Scan" goods. Doc. 35 at 11. Even putting aside its incompatibility with Section C(2)'s use of "In addition" to effectively create and set off different subsections, LifeWorks's argument cannot be reconciled with other aspects of Section C(2)'s text.

Section C(2) defines "Pay on Scan" to "mean that Vendor [LifeWorks] shall retain title to the merchandise until Walgreen has sold such merchandise, and payment for such merchandise shall not be due and owing by Walgreen to Vendor [LifeWorks] until after such time, as is agreed upon by the parties." Given that definition, it would be odd, if not nonsensical, for the rescission provision to be limited to "Pay on Scan" goods. After all, if Lifeworks retained title to "Pay on Scan" merchandise until Walgreen sold it to a Walgreen's customer, rescission of

7

Walgreen's purchase of that merchandise would be unnecessary, if not impossible, because there would be no purchase from LifeWorks to unwind until after a Walgreen's customer bought the merchandise, at which point rescission would involve taking that nonparty customer's property and declaring the purchase void. *See Chi. Limousine Serv., Inc. v. Hartigan Cadillac, Inc.*, 564 N.E.2d 797, 801 (Ill. 1990) (explaining that "to rescind is to declare a contract void in its inception and to put an end to it as though it never were. A 'RESCISSION' amounts to the unmaking of a contract, or undoing of it from the beginning.") (citations and internal quotation marks omitted); *Black's Law Dictionary* (10th ed. 2014) (defining the term "rescind" as "[t]o abrogate or cancel … unilaterally or by agreement; to make void; to repeal or annul"). Settled principles of contract interpretation counsel against such an interpretation. *See BKCAP, LLC v. CAPTEC Franchise Tr. 2000-1*, 572 F.3d 353, 360 (7th Cir. 2009) (noting that courts often "reject one party's strained, literal reading of contract language in favor of the other party's reasonable, commonsense reading"); *U.S. Fire Ins. Co. v. Hartford Ins. Co.*, 726 N.E.2d 126, 128 (Ill. App. 2000) (counseling the avoidance of "[s]trained, forced, unnatural, or unreasonable" contract construction).

This conclusion is confirmed by the internal structure of two key sentences of Section C(2). The sentence defining "Pay on Scan" goods states that "the term 'Pay on Scan' shall mean that Vendor [LifeWorks] shall retain title to *the merchandise* until Walgreen has sold *such merchandise*, and payment for *such merchandise* shall not be due and owing by Walgreen to vendor until after such time, as is agreed by upon by the parties" (emphasis added). Note that when the sentence first refers to the designated category ("Pay on Scan") of merchandise, it uses the phrase "*the* merchandise," while subsequent references to that category are to "*such* merchandise." Similarly, after establishing Walgreen's "unrestricted right to rescind its purchase

8

of *the merchandise* from Vendor," the rescission provision proceeds to say "both before and after acceptance of *such merchandise* by Walgreen." If the rescission provision governed only "Pay on Scan" goods, it would have provided for the "right to rescind [Walgreen's] purchase of *such* merchandise," thereby referring back to the "Pay on Scan" merchandise defined in the previous sentence. Instead, the rescission provision refers at the outset to "*the* merchandise," thereby connoting that the provision is no longer referring, and is not limited, to "Pay on Scan" goods.

LifeWorks also contends that Walgreen's reading of the rescission provision renders superfluous Section C(2)'s return provision—the text preceding the first "In addition"—which allows Walgreen to "return" or "cancel" excess, defective, or nonconforming merchandise "at Vendor's expense." There is no superfluity. The return provision states that Walgreen may return merchandise if LifeWorks sends excess, defective, or nonconforming goods; under those circumstances, LifeWorks bears the expense of returning the merchandise. The rescission provision, by contrast, states that Walgreen may rescind the purchase of merchandise for *any* reason, "both before and after acceptance of such merchandise by Walgreen"; under those circumstances, naturally, Walgreen bears the cost of returning the merchandise. Because they address different situations and allocate costs differently, the two provisions are not superfluous. *See Curia v. Nelson*, 587 F.3d 824, 829 (7th Cir. 2009) ("In construing contracts, to determine their intent, it is long established that a construction should be adopted, if possible … which harmonizes all the various parts so that no provision is deemed conflicting with, or repugnant to, or neutralizing of any other.") (quoting *Coney v. Rockford Life Ins. Co.*, 214 N.E.2d 1, 3 (Ill. App. 1966)); *see also Iteld, Bernstein & Assocs., LLC v. Hanover Ins. Grp.*, 2009 WL 2496552, at *4 (E.D. La. Aug. 12, 2009) (holding that there was no superfluity where two contractual provisions "address different situations"); *Valinote v. Ballis*, 2001 WL 1135871, at *5 n.15 (N.D.

Ill. Sept. 25, 2001) (holding that two contractual provisions were not superfluous because they had "different purposes").

LifeWorks next argues that Walgreen's interpretation of the rescission provision renders superfluous the BTA when read together with the Guaranteed Sale portion of the designated purchase order provision, reasoning that "Walgreens would not require a separate document [the BTA] to discuss guaranteed sales if the GTA provided for an absolute right of return." Doc. 35 at 11. LifeWorks's argument has some force. Because the parties agreed under the BTA that *all* merchandise that LifeWorks produced for Walgreen would be sold on a "Guaranteed Sale" basis, it is not clear why Walgreen needed the additional benefit of the rescission provision. As noted, the designated purchase order provision states that if a "purchase order is designated as a 'Guaranteed Sale' … transaction, Walgreen shall not be obligated to pay for any merchandise until after it is sold by Walgreen in accordance with terms agreed upon by the parties." Thus, the argument goes, the designated purchase order provision already releases Walgreen from the obligation to pay LifeWorks for any goods that it did not sell.

Even if there may be overlap between the designated purchase order provision and the rescission provision, that overlap does not undermine Walgreen's reading of Section C(2) by creating a fatal redundancy. *See In re Kazmierczak*, 24 F.3d 1020, 1022 (7th Cir. 1994) ("[W]e are not of the school that believes, contrary to all experience, that documents—contractual, statutory, or other—never contain redundant or meaningless terms."); *Raytheon Eng'rs & Constructors, Inc. v. SMS Schloemann-Siemag Akiengesellschaft*, 2000 WL 420866, at *3 (N.D. Ill. Mar. 16, 2000) ("Contracts frequently contain provisions that are not strictly necessary, either due to the draftsman's desire for completeness or simply his verbosity."). Rather, in context, the two provisions are most naturally read as regulating different aspects of the relationship between

Walgreen and LifeWorks. The designated purchase order provision governs the timing of payment for LifeWorks's goods (all designated as "Guaranteed Sale") that have been sold at Walgreen's stores; under that provision, Walgreen is not obligated to pay LifeWorks for any goods until they are sold at retail to Walgreen's customers. By contrast, the rescission provision permits Walgreen not to order any more goods from LifeWorks or accept goods already ordered—that is, to cancel any existing or future purchase orders. *See Allergease*, 2017 WL 66819, at *4 ("The contract expressly provides Walgreens with the right to rescind purchase orders."). Accordingly, because they have different purposes, the two provisions are not superfluous. *See Iteld*, 2009 WL 2496552, at *4; *Valinote*, 2001 WL 1135871, at *5 n.15.

Lifeworks also contends that Section 5(a) of Exhibit 1 of the GTA required Walgreen to give thirty days' notice of its decision to terminate its obligations under the GTA. Doc. 35 at 13; see Doc. 26-1 at 8 ("This Agreement shall remain in effect until terminated by either party on thirty (30) days' prior written notice … ."). But the operative complaint does not allege that Walgreen failed to provide such notice, Doc. 26, and so whether Walgreen complied with the thirty-day notice provision is not at issue in this case.

Finally, LifeWorks contends that the parties' prior course of dealing is relevant to whether Walgreen's cancellation was contemplated by the rescission provision. Doc. 35 at 7-8. To support this argument, LifeWorks points to Section 4(c) of Exhibit 1 of the GTA, which provides that "the conduct of the parties pursuant to this Agreement … shall, for all legal purposes, evidence a course of dealing and a course of performance accepted by the parties in furtherance of this Agreement … ." Doc. 26-1 at 8. But Illinois law clearly provides that the parties' course of dealing cannot contradict a contract's express terms. *See Echo, Inc. v. Whitson Co.*, 121 F.3d 1099, 1102 (7th Cir. 1997) (noting that, under the Uniform Commercial Code, "if

an express agreement and course of dealing cannot be reasonably construed as consistent, then the express terms control over the course of dealing"); *Midwest Builder Distrib., Inc. v. Lord & Essex, Inc.*, 891 N.E.2d 1, 27 (Ill. App. 2007) (holding, under the Uniform Commercial Code, that "if the express terms of the contract and the course of performance cannot be reconciled, express terms will trump course of performance. That is, a course of dealing between the parties is admissible to explain, supplement, or add to the agreement (but not contradict it).") (citation and internal quotation marks omitted); *Scott v. Assurance Co. of Am.*, 625 N.E.2d 439, 443 (Ill. App. 1993) (same); Richard A. Lord, 12 *Williston on Contracts* § 34:5 (4th ed. 2017) ("[U]sage cannot control words having a definite legal meaning," even if evidence of usage can be considered where "particular expressions have by trade used acquired a different meaning" than the "plain, ordinary, popular, or legal meaning"). And here, for the reasons stated above, the GTA's express terms clearly provide, under the rescission provision, that Walgreen has the unfettered right to cancel existing or future orders.

The cases cited by LifeWorks, Doc. 35 at 8-9, are not to the contrary. In *K's Merchandise Mart, Inc. v. Northgate L.P.*, 835 N.E.2d 965, 972 (Ill. App. 2005), the court noted that "course of dealing, usage of trade, and course of performance may be considered to *explain* or *supplement* the terms of an agreement" (emphasis added), but it did not hold that course of dealing could *contradict* a written contract's clear terms. Accordingly, *K's Merchandise* looked to the parties' course of dealing because the plain text of the relevant written agreements "did not address" the question at issue. *Ibid.* Likewise, in *Chicago and North Western Railway Co. v. Peoria and Pekin Union Railway Co.*, 360 N.E.2d 404, 407 (Ill. App. 1977), the court determined "that the pertinent contract language is ambiguous," and thus looked to the parties'

"course of conduct" to resolve their dispute.  The court thus did not rely on the parties' course of dealing to contradict unambiguous contract language.

**Conclusion**

For the foregoing reasons, Walgreen's partial motion to dismiss is granted.  Counts II and III of the operative complaint are dismissed.  Because the defects in those counts are incurable, *see Gonzalez-Koeneke v. West*, 791 F.3d 801, 808 (7th Cir. 2015); *Leavell v. Ill. Dep't of Nat. Res.*, 600 F.3d 798, 808 (7th Cir. 2010), and because LifeWorks does not request an opportunity to amend if Walgreen's motion were granted, *see Boogaard v. Nat'l Hockey League*, 255 F. Supp. 3d 753, 766 (N.D. Ill. 2017) (denying leave to amend where the plaintiff did not request leave to amend his complaint, and citing cases); *White v. City of Chicago*, 149 F. Supp. 3d 974, 983 (N.D. Ill. 2016) (same), the dismissal is with prejudice.

January 10, 2018

United States District Judge